**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHAWN VAN ASDALE; LENA VAN
ASDALE,
       *Plaintiffs-Appellants,*

v.

INTERNATIONAL GAME TECHNOLOGY,
       *Defendant-Appellee,*

v.

BARRY F. IRVIN; KIRKLAND &
ELLIS,
       *Third-party-defendant.*

No. 07-16597

D.C. No.
CV-04-00703-RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert A. McQuaid, Magistrate Judge, Presiding

Argued and Submitted
March 12, 2009—San Francisco, California

Filed August 13, 2009

Before: J. Clifford Wallace, Sidney R. Thomas, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Margo Piscevich (argued), Mark J. Lenz, Piscevich & Fenner, Reno, Nevada, for the plaintiffs-appellants.

Richard G. Campbell Jr. (argued), Lance P. Maiss, Armstrong Teasdale LLP, Reno, Nevada, Gordon E. Krischer, Nathaniel L. Dilger, Mark W. Robertson, O'Melveny & Myers LLP, Los Angeles, California, for the defendant-appellee.

**OPINION**

BYBEE, Circuit Judge:

This case presents our first opportunity to examine the substantive requirements necessary to establish a claim under the whistleblower-protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. Plaintiffs Shawn and Lena Van Asdale appeal from the district court's summary judgment in favor of their former employer, International Game Technology ("IGT"), on their claim of retaliatory discharge in violation of § 1514A, as well as the district court's dismissal of their factually-related Nevada state-law claims. We conclude

that the Van Asdales raised a genuine issue of material fact regarding the cause of their terminations and that summary judgment should not have been granted. We reverse the district court's summary judgment in favor of IGT on the Van Asdales' Sarbanes-Oxley claim and vacate the dismissal of their state-law claims.

## I.   FACTS AND PROCEEDINGS BELOW

IGT is a publicly-traded, Nevada-based company specializing in computerized gaming machines and similar products. The company hired Shawn and Lena[1] in January 2001 to work as in-house intellectual property ("IP") attorneys in Nevada. Both had previously worked for law firms in Chicago. During all periods relevant to this suit, neither plaintiff was admitted to practice law in any state other than Illinois.

Both Shawn and Lena were initially hired for the position of Associate General Counsel. In September 2002, Shawn was promoted to Director of Strategic Development, a position in which he was generally responsible for overseeing IGT's IP litigation. Similarly, Lena was promoted in the Spring of 2003 to Director of IP Procurement, and was responsible for the transactional side of IGT's IP division, which included managing IGT's patents, trademarks, and copyrights. After their promotions, both Shawn and Lena reported directly to IGT's General Counsel. When Shawn and Lena began their employment with IGT, that position was held by Sara Beth Brown; Brown was replaced by David Johnson in November 2003.

In 2001, IGT began merger negotiations with Anchor Gaming ("Anchor"). The gist of this lawsuit is that the Van Asdales contend they were terminated for reporting possible shareholder fraud in connection with that merger. We provide

---

[1]We will refer to each individual plaintiff by their first name, but the plaintiffs collectively as the Van Asdales.

some general facts surrounding the merger as background. We emphasize that our discussion of *possible* fraud is based on concerns the Van Asdales held and that they allegedly shared with their supervisors; our account should not be taken as proof of any actual fraud. Indeed, the success, or failure, of the Van Asdales' lawsuit does not depend on their ability to show any actual fraud, only that they reasonably believed that fraud had occurred. *See* Part II.B.1.a *infra*.

In September 2001, prior to Anchor's merger with IGT, Bally Gaming ("Bally"), one of Anchor's competitors, began advertising a new "Monte Carlo" slot machine featuring a "bonus wheel." Two high-level Anchor employees, Mark Hettinger, the head of Anchor's IP Department, and T.J. Matthews, Anchor's CEO, asserted that the Monte Carlo machine infringed on a particular patent owned by Anchor known as the "wheel" patent. Bally argued, however, that the wheel patent was invalidated by prior art, specifically, Bally's vintage 1970's Monte Carlo machine. By all accounts the wheel patent was a very valuable part of Anchor's holdings.

According to Shawn, as part of his department's due diligence in connection with the proposed IGT-Anchor merger, he investigated this dispute by arranging to purchase a vintage Monte Carlo machine in Chicago and sending it to IGT's outside patent litigation counsel so that counsel could assess the impact of the machine on Anchor's patent. Shawn subsequently met with outside counsel to discuss the possibility that the wheel patent could be redrafted. After IGT's inner circle had discussed the issue, the company decided to go forward with the merger, a decision in which Shawn evidently concurred.

In August 2003, well after Anchor and IGT had merged, the U.S. Patent and Trademark Office issued IGT a new patent. In anticipation of pending litigation against Bally, IGT's outside litigation counsel Barry Irwin contacted Hettinger to discuss defenses to patent infringement claims Bally

had previously raised. Hettinger responded that Bally had sent written materials outlining such defenses to Joe Walkowski, Anchor's patent prosecution counsel prior to that company's merger with IGT. Irwin contacted Walkowski, who found the written materials, including an "Australian Flyer"—which described an Australian version of the Monte Carlo machine —and emailed them to Irwin and Lena. Shawn reviewed the materials and he and Irwin subsequently agreed that the Australian Flyer had the effect of invalidating the 2003 patent and undermining IGT's claims against Bally. Potentially, if Anchor's wheel patent was invalid, the benefits of the merger may have been overvalued.

Shawn spoke with Brown, IGT's General Counsel at the time. He informed her of his view that litigation against Bally could not go forward. Surprised by this news, Brown called IGT's merger counsel to see if the Australian Flyer had been included in the due diligence files provided to IGT prior to the merger. In a follow-up meeting, Shawn expressed concern that the Australian Flyer had not been disclosed to IGT prior to the merger; Brown told him that the matter warranted investigation and promised to look into it. Around the same time, Shawn also brought the issue to the attention of Rich Pennington, IGT's Vice President of Product Development.

In the meantime, management had changed at IGT after the merger with Anchor. Matthews was named CEO, and he asked Johnson to replace Brown as IGT's General Counsel. Johnson had previously served as General Counsel at Anchor during the months surrounding Anchor's merger with IGT.

Shawn and Lena both met with Johnson on November 24. The parties sharply dispute what occurred during this meeting. Shawn, Lena, and Johnson all agree that Shawn and Lena raised the subject of the Australian Flyer and its impact on the August 2003 patent. According to Johnson, however, the three only discussed the topic to address the possibility that

Bally would assert a defense of fraud on the Patent Office in pending litigation against IGT.[2]

Within a few months of this meeting, both Shawn and Lena were terminated. According to Johnson, he decided sometime around Thanksgiving of that year—just three days after his meeting with Shawn and Lena—that he did not believe Shawn should continue in his current position. Johnson planned to deliver this news to Shawn around that time but he was unable to schedule a meeting—initially because Shawn was on a business trip overseas and later because Shawn contracted cancer. Upon Shawn's return to IGT in January 2004, Johnson told him that he and other IGT executives felt that he should be removed from his position. Although Johnson evidently expressed some hope in January that Shawn could continue at the company in a different capacity, Shawn was formally terminated on February 11.

Johnson testified that at the time he terminated Shawn he had no similar plans to end Lena's employment. However, Johnson claimed that, within weeks of Shawn's termination, he received complaints from the Engineering Department that Lena's demeanor "had become very odd" and "that she had

---

[2]As we discuss in Part II.B.1, this factual dispute is complicated by the manner in which this issue was litigated in the district court. After Shawn, Lena, and Johnson completed their deposition testimony in this case, IGT filed a motion for summary judgment. It construed Shawn and Lena's deposition testimony as alleging only that they informed Johnson of a possible fraud on the Patent Office, and asserted that this type of disclosure was not protected conduct under § 1514A. Shawn then submitted a sworn declaration in which he stated that he had "consistently told [his] supervisors of two possible frauds, the first a general fraud on IGT (including [Shawn] and other IGT shareholders) arising out of the omissions by Anchor during due diligence affecting the value of its Wheel patents, and the second, a specific fraud against the U.S. Patent Office arising out of the non-disclosure of what have been called the 'Trask-Britt documents.' " Shawn stated in his declaration that, in questioning him at the deposition, IGT's counsel had focused on only the second possible type of fraud, and that, had he been asked, he would have also testified about the first type.

become extremely difficult and extremely unfriendly." A different IGT employee also learned in early 2004 that Lena had twice requested access to allegedly sensitive information related to "Class 2" gaming. Johnson terminated Lena shortly thereafter.

On December 1, 2004, the Van Asdales brought the present action in the United States District Court for the District of Nevada. The complaint sought relief under the whistleblower protection provisions of Sarbanes-Oxley; both plaintiffs also brought state-law claims for tortious discharge and intentional interference with contractual relations. Lena brought a separate state-law claim for retaliation and Shawn brought a separate state-law claim for intentional infliction of emotional distress.

IGT moved for summary judgment on November 22, 2006. On June 13, 2007, the district court issued a published decision granting IGT's motion for summary judgment. *Van Asdale v. Int'l Game, Tech.*, 498 F. Supp. 2d 1321 (D. Nev. 2007). After the district court denied the Van Asdales' motion for reconsideration, the Van Asdales timely appealed to this court.

## II.   ANALYSIS

We review the district court's grant of summary judgment de novo. *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 918 (9th Cir. 2009). In doing so, "[w]e must determine, viewing the evidence in the light most favorable to [the Van Asdales] . . . whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

### A.   *Attorney-Client Privilege*

In addition to defending the district court's summary judgment on the Van Asdales' Sarbanes-Oxley claim, IGT argues

that we should affirm the district court's judgment because (1) the Van Asdales are prohibited from maintaining the action under their ethical obligations as Illinois-licensed attorneys and (2) notwithstanding the particular requirements of Illinois law, we should not permit this case to go forward because the Van Asdales cannot establish their claim without using attorney-client privileged information. Although the district court rejected both of these arguments, "[w]e may affirm on any ground supported by the record, even if it differs from the district court's rationale." *S. Cal. Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co., Inc.*, 558 F.3d 1028, 1034 n.5 (9th Cir. 2009) (internal quotation marks omitted) (alteration in original). We address each argument in turn.

First, IGT argues that the Van Asdales, as Illinois-licensed attorneys, cannot maintain this action because to do so would violate state rules of professional conduct. *See* Ill. Rules of Prof'l Conduct R. 8.5(b)(2)(I) ("[I]f the lawyer is licensed to practice only in this jurisdiction, the rules to be applied shall be the rules of this jurisdiction.").

**[1]** IGT relies on *Balla v. Gambro, Inc.*, 584 N.E. 2d 104 (Ill. 1991), for support, but this case is distinguishable. In that case, the Illinois Supreme Court held that "in-house counsel do not have a claim under the tort of retaliatory discharge." *Id.* at 108. However, the court in Balla further explained that it "base[d its] decision as much on the nature and purpose of the tort of retaliatory discharge, as on the effect on the attorney-client relationship that extending the tort would have." *Id.* The court then offered a detailed analysis of the purposes served by the Illinois tort of retaliatory discharge.

**[2]** We have found no cases, and IGT cites none, where *Balla* has been applied to bar suits by in-house attorneys based on non-Illinois law. Indeed, it appears that federal courts in Illinois have uniformly declined to apply *Balla* to claims based on federal law. *See, e.g.*, *Stinneford v. Spiegel Inc.*, 845 F. Supp. 1243, 1246-47 (N.D. Ill. 1994) (holding

that in-house counsel may bring suit under the Age Discrimination in Employment Act)*; Rand v. CF Indus., Inc.*, 797 F. Supp. 643, 645 (N.D. Ill. 1992) (same); *Hoskins v. Droke*, No. 94 C 5004, 1995 WL 318817, at *3 (N.D. Ill. May 24, 1995) (holding that in-house counsel may pursue a retaliation claim under Title VII against his former employer). We thus reject this argument.

IGT next argues that, irrespective of the specific rules applicable to Illinois-licensed attorneys, the Van Asdales should not be permitted to maintain their Sarbanes-Oxley claim because doing so requires use of attorney-client privileged information. IGT reasons that the Van Asdales' only evidence of protected activity consists of a conversation the two had with Johnson regarding a pending litigation matter involving the company.

**[3]** There are few federal circuit court cases addressing the right of in-house counsel to use attorney-client privileged information in a retaliation suit. In *Willy v. Administrative Review Board*, 423 F.3d 483 (5th Cir. 2005), an in-house attorney brought suit against his former employer, alleging retaliation as a result of a report he had written; it was undisputed that the contents of the report were covered by the attorney-client privilege. *Id.* at 494 n.48. The Fifth Circuit allowed the suit to go forward, rejecting the notion "that the attorney-client privilege is a *per se* bar to retaliation claims under the federal whistleblower statutes, i.e., that the attorney-client privilege mandates exclusion of all documents subject to the privilege." *Id.* at 500. However, *Willy* involved a claim before an administrative law judge and the Fifth Circuit expressly reserved the question of whether its holding would apply to "a suit involving a jury and public proceedings." *Id.* at 500-01.

Similarly, in *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173 (3d Cir. 1997), the Third Circuit held that a former in-house attorney could maintain a Title VII suit for retalia-

tory discharge; the Third Circuit reasoned that "concerns about the disclosure of client confidences in suits by in-house counsel" did not alone warrant dismissal of the plaintiff's action. *Id.* at 181. Rather, the Third Circuit suggested that a district court should "balanc[e] the needed protection of sensitive information with the in-house counsel's right to maintain the suit," while considering any protective measures that might be taken at trial to safeguard confidential information. *Id.* at 182.

**[4]** Although neither case is precisely on point, we agree with the careful analysis of the Third and Fifth Circuits and hold that confidentiality concerns alone do not warrant dismissal of the Van Asdales' claims. As a threshold matter, it is not at all clear to us to what extent this lawsuit actually requires disclosure of IGT's confidential information. Shawn and Lena allege that they raised claims of shareholder fraud at their November 24, 2003 meeting with Johnson and that they were terminated in retaliation for these allegations. There is no reason why the district court cannot limit any testimony regarding this meeting to these alleged disclosures, while avoiding testimony regarding any litigation-related discussions that also took place. To the extent this suit might nonetheless implicate confidentially-related concerns, we agree with the Third Circuit that the appropriate remedy is for the district court to use the many "equitable measures at its disposal" to minimize the possibility of harmful disclosures, not to dismiss the suit altogether. *Id.* at 182.

We also note that the text and structure of the Sarbanes-Oxley Act further counsel against IGT's argument. Section 1514A(b) expressly authorizes any "person" alleging discrimination based on protected conduct to file a complaint with the Secretary of Labor and, thereafter, to bring suit in an appropriate district court. Nothing in this section indicates that in-house attorneys are not also protected from retaliation under this section, even though Congress plainly considered the role attorneys might play in reporting possible securities fraud.

*See, e.g.*, 15 U.S.C. § 7245. We thus agree with the district court that dismissal of the Van Asdales' claims on grounds of attorney-client privilege is unwarranted.

B.    *Sarbanes-Oxley Act*

We now address whether the district court correctly granted IGT summary judgment on the Van Asdales' Sarbanes-Oxley claim. We observe at the outset that there are no published cases in this circuit setting forth the substantive elements of a Sarbanes-Oxley claim. The text of the statute and regulations promulgated by the Department of Labor, however, set forth the general framework governing such actions.

[5] Section 1514A(a)(1) of Title 18 prohibits employers of publicly-traded companies from "discriminat[ing] against an employee in the terms and conditions of employment" for "provid[ing] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."

[6] Section 1514A(b)(2) further specifies that § 1514A claims are governed by the procedures applicable to whistle-blower claims brought under 49 U.S.C. § 42121(b). Section 42121(b)(2)(B), in turn, sets forth a burden-shifting procedure by which a plaintiff is first required to make out a prima facie case of retaliatory discrimination; if the plaintiff meets this burden, the employer assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity. We first address whether the Van Asdales have made out a prima facie showing of retaliatory discrimination.

### 1.   Prima Facie Case

**[7]** Regulations promulgated by the Department of Labor set forth four required elements of a prima facie case under § 1514A: (a) "[t]he employee engaged in a protected activity or conduct"; (b) "[t]he named person knew or suspected, actually or constructively, that the employee engaged in the protected activity"; (c) "[t]he employee suffered an unfavorable personnel action"; and (d) "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." 29 C.F.R. § 1980.104(b)(1)(i)-(iv). We address each element in turn.

### a.   Protected Activity

**[8]** In *Platone v. FLYi, Inc.*, 25 IER Cases 278, 287 (Dep't of Labor Sept. 19, 2006), the Administrative Review Board of the Department of Labor ("ARB") held that, to constitute protected activity under Sarbanes-Oxley, an "employee's communications must 'definitively and specifically' relate to [one] of the listed categories of fraud or securities violations under 18 U.S.C.[ ] § 1514A(a)(1)." The three circuits that have addressed the issue have all agreed with the ARB's interpretation, *see Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009) ("The employee must show that his communications to the employer specifically related to one of the laws listed in § 1514A."); *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008) ("[A]n employee must show that his communications to his employer definitively and specifically relate to one of the laws listed in § 1514A.") (internal alteration and quotation marks omitted); *Allen v. Admin. Review Bd.*, 514 F.3d 468, 476 (5th Cir. 2008) ("We agree with the ARB's legal conclusion that an employee's complaint must definitively and specifically relate to one of the six enumerated categories found in § 1514A.") (internal quotation marks omitted), and we similarly defer to the ARB's reasonable interpretation of the statute.

**[9]** We agree with the district court that Shawn's conversations with Brown and Pennington satisfy this "definitively and specifically" standard. According to Brown's deposition testimony, Shawn told her that Hettinger and Mathews "knew more than they were saying," that they were aware of the Australian Flyer and had not disclosed it prior to the merger, and that "there's a possibility it could go to the top." Brown testified that it was her impression after the meeting that Shawn believed that IGT had been misled regarding Anchor's value prior to the merger.

With respect to Shawn's conversation with Pennington, Pennington testified that Shawn told him that documents received from Walkowski contained prior art that Anchor knew or should have known about prior to the merger but did not disclose. In his deposition testimony, Pennington indicated that his recollection was that Shawn merely intimated that the omission was a mistake but conceded that it was possible Shawn suggested at that meeting that the omission was intentional. Shawn, for his part, asserts that Pennington told him that he believed Matthews had intentionally concealed the Australian Flyer and that the merger never would have happened if the Flyer had been disclosed.

**[10]** To be sure, Brown testified that she did not believe Shawn used the words "fraud," "fraud on shareholders," or "stock fraud" and she could only say that Shawn "may have" used the term "Sarbanes-Oxley" or "SOX"; the record similarly contains no evidence that Shawn used any such language in his conversation with Pennington. However, as the Fourth Circuit has recognized, "[a]n employee need not cite a code section he believes was violated" to trigger the protections of § 1514A. *Welch*, 536 F.3d at 276 (internal quotation marks omitted). It is clear to us that, taking the facts in the light most favorable to the Van Asdales, Shawn's statements to both Brown and Pennington reported conduct that definitively and specifically related to shareholder fraud. That is all that § 1514A requires.

The parties also dispute whether the Van Asdales similarly engaged in protected conduct during their November 24, 2003 meeting with Johnson. As noted above, IGT asserts that the meeting only involved discussions of a potential fraud on the Patent Office defense in pending litigation and the district court accepted this argument.

We agree with the district court that if IGT's characterization of the Van Asdales' meeting with Johnson is taken as true, the conversation did not involve activity protected under § 1514A. The Van Asdales' theory of shareholder fraud concerns the possibility that Anchor harmed IGT's shareholders by intentionally withholding information from IGT in late 2001. By contrast, the parties agree that any discussion of fraud on the Patent Office concerned a *defense* Bally might assert in future litigation, a defense that would be based upon IGT's admitted failure to disclose the same information to the Patent Office in 2003. This latter topic has nothing to do with shareholder fraud and is certainly not "definitively and specifically" related to it. However, this was not the uncontroverted evidence before the district court.

Johnson executed a sworn declaration stating that neither Shawn nor Lena made any suggestion to him regarding a potential fraud on the shareholders; however, this declaration directly contradicted Shawn's affidavit. Typically, of course, such a stark factual dispute must be decided by a fact finder and cannot be resolved on summary judgment. In this case, however, the district court disregarded the portion of Shawn's declaration in which he said that he raised concerns of shareholder fraud with Johnson, because the district court viewed this portion of the declaration as contradicting Shawn's deposition testimony.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Every circuit has some form of

"sham affidavit" rule similar to our own. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (collecting cases).

The Supreme Court has explained that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation marks omitted). Some form of the sham affidavit rule is necessary to maintain this principle. This is because, as we have explained, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985)).

At the same time, however, it must be recognized that the sham affidavit rule is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence. Aggressive invocation of the rule also threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys. We have thus recognized that the sham affidavit rule "should be applied with caution." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993); *see also Nelson v. City of Davis*, ___ F.3d ___ (9th Cir. 2009).

More specifically, we have fashioned two important limitations on a district court's discretion to invoke the sham affidavit rule. First, we have made clear that the rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony," *Kennedy*, 952 F.2d at 266-67; rather, "the district

court must make a factual determination that the contradiction was actually a 'sham.' " *Id.* at 267. Second, our cases have emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

**[11]** In the present case, neither of these two conditions are satisfied. As to the first, the district court simply asserted that, "[b]ecause [the relevant] portion of [Shawn's] declaration contradicts [his] deposition testimony it must be disregarded." 498 F. Supp. 2d at 1331. This statement is directly contrary to the rule set forth in *Kennedy* that the sham affidavit "rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." 952 F.2d at 266-67. The district court did not make a specific factual finding that the affidavit was a sham as it was required to do prior to striking it.

**[12]** If this were the only defect in the district court's analysis of Shawn's affidavit, we would simply remand this case to allow the district court to make the necessary factual findings. *See, e.g.*, *id.* at 267 ("At the time the district court found Kennedy's later declaration to be an attempt to create a 'sham issue of fact,' we had not yet made clear that [the sham affidavit rule] does not apply to every instance when a later affidavit contradicts deposition testimony . . . . Accordingly we remand this case to the district court so that it may make that necessary determination."). We decline to do so, however, because we conclude that the minor conflicts between Shawn's earlier deposition testimony and subsequent declaration, if there are any, do not justify invocation of the sham affidavit rule.

**[13]** Contrary to the district court's determination, nothing in Shawn's declaration "flatly contradicts," *id.*, his earlier deposition testimony. Shawn's declaration clarifies that at the November 24, 2003 meeting with Johnson, he raised allegations of shareholder fraud *in addition to* a specific fraud on the Patent Office defense. This statement does not contradict his earlier deposition testimony. At the deposition, IGT's counsel began by asking Shawn about the content of any discussion regarding "deliberate nondisclosure of [the Australian Flyer and related] documents." Shawn claimed that he told Johnson "[t]hat it at least appears suspicious and there is a potential of fraud." In response to a subsequent question, Shawn made clear that he did not remember Johnson saying "anything in response to that statement." Only *after* IGT's counsel asked him if he recalled any "other statements" did Shawn begin discussing the need to investigate defenses Bally might assert in any future patent prosecution. Because of the line of questioning pursued by IGT's counsel, Shawn "provided only cursory testimony" regarding his initial statements to Johnson regarding fraud, *see SEC v. Phan*, 500 F.3d 895, 910 (9th Cir. 2007); his subsequent declaration was a legitimate attempt to "explain[ ] or clarify[ ] prior testimony elicited by opposing counsel on deposition." *Messick*, 62 F.3d at 1231.

A close examination of Shawn's deposition testimony offers at least three additional reasons why it is otherwise consistent with his subsequent declaration. First, at one point in Shawn's deposition testimony, Shawn stated that he and Johnson discussed Hettinger's claim that he had not previously seen the Australian Flyer. Although Hettinger's possible prior knowledge of the Australian Flyer might have some tangential relevance in a discussion about Bally's possible legal defenses in a patent prosecution, it would seem to be *precisely* the sort of subject one would expect to come up in a discussion about possible fraud in connection with the IGT-Anchor merger. Second, after IGT's counsel asked about the "deliberate nondisclosure of Trask-Britt documents," Shawn responded by

stating that he told Johnson the nondisclosure "appear[ed] suspicious." Again, it seems strange that Shawn would take the drastic step of characterizing a co-employee's actions as "suspicious" if the discussion was merely aimed at analyzing possible legal defenses of a potential opposing party. Finally, the Van Asdales' interpretation is consistent with deposition testimony regarding Shawn's earlier conversations with Pennington and Brown, in which he appears to have clearly suggested that Matthews and Hettinger had wrongfully withheld the Flyer during the merger process.[3]

[14] The analysis above is not intended as an endorsement of the factual account provided in Shawn's declaration. A jury could find Shawn's account not credible and thus conclude that the meeting with Johnson did not qualify as protected activity under § 1514A. But it is not our place to make this determination. Shawn's declaration suffices to raise a genuine issue of material fact regarding the nature of the Van Asdales'

---

[3]IGT also points to two occasions in which, according to them, "the Van Asdales candidly admit that they made conscious decision *not* to blow the whistle." The first example is Lena's deposition testimony that she raised no complaints about "shareholder fraud," or "Sarbanes-Oxley violations," and her rationalization that "obviously, if any of that occurred, we may have been accusing our boss at the time, who was T.J. Matthews." However, these comments concerned a much larger meeting with upper management, not the later meeting with Johnson. Moreover, in this testimony Lena was referring to everyone in attendance at the meeting, not herself personally.

IGT also points to Shawn's statement that he did not "want to go out and just start saying that T.J. committed fraud on shareholders to the tune of 1.4 billion without having more to rely on." However, this deposition testimony concerned Shawn's statements at his August meeting with Pennington; moreover, the testimony surrounding this statement indicates that Shawn and Pennington were discussing the possibility that Matthews had unlawfully withheld the Flyer. The statement quoted by IGT thus appears to simply indicate that Shawn was concerned about raising such serious allegations prematurely; this is perfectly consistent with a claim that Shawn felt the issues should be raised in a private meeting with Johnson three months later.

disclosures to Johnson, and the district court should not have disregarded it. We thus conclude that, taking the facts in the light most favorable to the Van Asdales, their meeting with Johnson involved disclosures "definitively and specifically" related to shareholder fraud.

**[15]** This conclusion, as well as our analysis of Shawn's meetings with Brown and Pennington, do not settle the question of whether the statements constituted protected activity under § 1514A. As noted above, § 1514A prohibits discriminating against an employee for "provid[ing] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of" a listed law. The plain language of this section, as well as the statute's legislative history and case law interpreting it, suggest that to trigger the protections of the Act, an employee must also have (1) a subjective belief that the conduct being reported violated a listed law, and (2) this belief must be objectively reasonable. *See Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009); *Day*, 555 F.3d at 54; *Welch*, 536 F.3d at 275; *Allen*, 514 F.3d at 477 ("We agree that an employee's reasonable belief must be scrutinized under both a subjective and objective standard."); S. Rep. No. 107-146, at 19 (2002) ("[S]ubsection (a)(1) . . . is intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts.").

**[16]** We first address whether the circumstances in which the Van Asdales found themselves permitted them to form an objectively reasonable belief that the apparent failure to disclose the Australian Flyer to IGT prior to the merger constituted shareholder fraud. We agree with the First Circuit that, "[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud." *Day*, 555 F.3d at 55. The Supreme Court has explained that a private action for securities fraud "resembles, but is not identical to, common-law tort actions for

deceit and misrepresentation," and that its elements include a material misrepresentation or omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Similarly, we have held that, in order to prove securities fraud under Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

**[17]** We conclude that the Van Asdales' theory of fraud approximates a securities fraud claim. It seems clear that the wheel patent was an important asset that Anchor brought to the merger with IGT. Matthews stated in his declaration that the "Wheel Patents, and the machines that are covered by the patents, generate a substantial portion of IGT's total income." Johnson, for his part, testified that "the wheel patent is of such importance to IGT that it utterly eclipses the relative importance of any . . . other claimed accomplishments. It's [sic] wheel is the Crown Jewel of IGT's intellectual property portfolio." Moreover, Shawn testified that Pennington told him that the merger would not have occurred if IGT had been made aware of the Flyer. Given the potential importance of the Australian Flyer and related documents, the top management positions at IGT occupied by several former Anchor officials, and their alleged financial motives favoring nondisclosure, we hold that it was objectively reasonable for Shawn and Lena to suspect that the non-disclosure of the Flyer prior to the merger could have been deliberate.

**[18]** In reaching this conclusion, we wish to make absolutely clear that we are not suggesting that former Anchor officials *actually did* engage in wrongdoing prior to the merger with IGT. As IGT points out, there is no evidence that anyone at Anchor instructed the company's outside counsel not to disclose the Australian Flyer prior to the merger. It is

also possible that the Australian Flyer and related documents were, in any event, not as important to the validity of the wheel patent as the Van Asdales claim, though IGT has not pressed this argument on appeal. It is not critical to the Van Asdales' claim that they prove that Anchor officials actually engaged in fraud in connection with the merger; rather, the Van Asdales only need show that they reasonably believed that there might have been fraud and were fired for even suggesting further inquiry. To encourage disclosure, Congress chose statutory language which ensures that "an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected." *Allen*, 514 F.3d at 477. We think that the Van Asdales have met this minimal threshold requirement.

We also conclude that the Van Asdales had a subjective belief that the conduct that they were reporting violated a listed law. The legislative history of Sarbanes-Oxley makes clear that its protections were "intended to include all good faith and reasonable reporting of fraud, and [that] there should be no presumption that reporting is otherwise, absent specific evidence." 148 Cong. Rec. 57420 (daily ed. July 26, 2002) (statement of Sen. Leahy). In this case, there is no evidence that Shawn's various complaints were made in bad faith and IGT does not suggest otherwise.

By contrast, the district court held that no reasonable jury could find that Lena subjectively believed that shareholder fraud had occurred. The testimony on which the district court appeared to rely in support of this conclusion went as follows:

> Q Prior to retaining [legal counsel], did you have any personal belief that a fraud had been perpetrated on the shareholders of IGT?
>
> A I had a belief that something had happened in the due diligence with Anchor and IGT and that an

investigation needed to be conducted to see if a fraud had occurred.

Q So you didn't have a specific belief that a fraud had occurred or not?

A I had a belief that an investigation needed to occur.

Q So you hadn't reached a conclusion one way or another as to fraud?

A No, because we were not allowed to do an investigation.

Q Okay. But you had a strong belief that an investigation needed to be done?

A Yes.

The district court's conclusion that this testimony precluded Lena from claiming protection under the Sarbanes-Oxley Act is contrary to the language of § 1514A. Although Lena acknowledged that she "hadn't reached a conclusion" as to whether fraud had occurred, the context of this statement was Lena's discussion of the need for an investigation. Moreover, in passing the Sarbanes-Oxley Act, Congress noted the existence of "a culture, supported by law, that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally." S. Rep. No. 107-146, at 5 (2002). Requiring an employee to essentially prove the existence of fraud before suggesting the need for an investigation would hardly be consistent with Congress's goal of encouraging disclosure.

[19] We thus conclude that, taking the facts in the light most favorable to the Van Asdales, as we must for the purposes of summary judgment, Shawn's communications with

Brown and Pennington, as well as the Van Asdales' meeting with Johnson, involved activities protected by § 1514A.

### b.    Knowledge of Decision-Maker

To establish a prima facie case under § 1514A, the Van Asdales also must establish that "[t]he named person knew or suspected, actually or constructively, that the employee engaged in the protected activity." 29 C.F.R. § 1980.104(b)(1)(ii).[4] This language is hardly a model of clarity (for example, it is not at all clear to us how one can constructively suspect someone of engaging in protected activity) but under any interpretation this element is satisfied here. As we have stated above, taking the Van Asdales' deposition testimony and Shawn's sworn declaration as true, the Van Asdales engaged in protected activity during the November 24, 2003 meeting with Johnson, as well as with Brown, and Pennington. It is undisputed that these persons have "supervisory authority" over the Van Asdales. 18 U.S.C. § 1514A(a)(1)(c).

### c.    Unfavorable Personnel Action

IGT does not dispute that the Van Asdales satisfy this required element.

### d.    Contributing Factor

The final element of a prima facie case under § 1514A is that "[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the unfavorable action." 29 C.F.R. § 1980.104(b)(1)(iv). As the district court correctly observed, the Van Asdales have not put forth any direct evidence that their protected activity was a

---

[4]Section 1980.101, in turn, defines "named person" as "the employer and/or the company or company representative named in the complaint who is alleged to have violated the Act." 29 C.F.R. § 1908.101

contributing factor to their termination. The primary evidence on this issue is circumstantial: the proximity of the Van Asdales' terminations to the November 24, 2003 meeting with Johnson.

[20] We conclude that the Van Asdales have raised a genuine issue of material fact regarding whether their protected activity was a contributing factor to their terminations. We have previously held that "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). In *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987), we held that causation could be inferred where the first adverse employment action took place less than three months after an employee's protected activity. We have since made clear that "a specified time period cannot be a mechanically applied criterion," and have cautioned against analyzing temporal proximity "without regard to its factual setting." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

In this case, Shawn was terminated approximately two and a half months after the November 24 meeting with Johnson, and Johnson acknowledged that he initially intended to terminate Shawn within three days of the meeting; Lena was fired several weeks after Shawn. Although we express no opinion on the merits of the Van Asdales' claims, we hold that a reasonable fact finder could find that the Van Asdales' alleged disclosures were a contributing factor in their terminations where, among other things, both Shawn and Lena were removed from their positions within weeks of their alleged protected conduct.

A closer examination of the "factual setting" of the Van Asdales' terminations also lends support to their theory of unlawful retaliation. Both Shawn and Lena were hired in January 2001; after observing Shawn's performance for eighteen months, he was promoted to a high-level position, and Lena

was similarly promoted several months later. On November 10, 2003, Shawn received an exceptional performance review. Two weeks later, however, Shawn and Lena met with Johnson, where they allegedly accused high-level IGT executives who had previously worked at Anchor of intentionally withholding material information prior to the merger. Johnson had served as General Counsel for Anchor during the months prior to the merger and he had worked with Matthews and Hettinger; moreover, Matthews had also hired Johnson after taking over as CEO of IGT. A mere three days after this meeting, and only seventeen days after Shawn had received a positive performance review, Johnson had decided to terminate Shawn, a decision that was delayed only because Shawn subsequently became ill. Several weeks after that, Johnson terminated Lena as well.

For its part, IGT asserts that Shawn was terminated for poor job performance. Johnson testified that Matthews told him that Shawn's behavior and demeanor were causing difficulties among various departments. Johnson also claimed that conversations with several colleagues from other companies that worked with IGT raised similar concerns about Shawn's work and attitude. Matthews generally corroborated Johnson's assertions. This testimony, however, is in tension with other contemporaneous evidence of Shawn's strong performance at IGT, including his promotion to Director of Strategic Development and his strong evaluation from Brown just weeks prior to his termination.

To be sure, IGT's proffered reasons could be entirely legitimate; IGT appears to have been in a period of transition in late 2003 and Johnson was certainly not obligated to accept his predecessor's apparent belief that Shawn was performing his job well. However, given the close proximity of Shawn's termination to his alleged protected activity, his seemingly positive record at IGT, and the dearth of specific evidence in the record supporting Johnson's and Matthews's claims about

his performance, a reasonable fact finder could find that Shawn's protected activity contributed to his termination.

Our analysis with respect to Lena's termination is similar. Like Shawn, Lena was promoted shortly after joining IGT in 2001, and the record is bereft of specific evidence that she was performing her job inadequately. In addition to claims that she had become "extremely difficult and extremely unfriendly," after Shawn's termination, IGT asserts that Lena was terminated because she twice requested access to sensitive information related to "Class 2" gaming, and IGT feared that she was attempting to obtain information that could benefit her husband. These attempts to access sensitive information may well have constituted serious breaches of protocol that were wholly beyond the scope of Lena's job duties. However, IGT simply declares in conclusory terms that Lena's conduct was improper, while Lena counters that she accessed this information in the normal course of her work. We are not in a position to resolve this dispute; on the current record, only a fact finder can. As with her husband's claim, a fact finder could reasonably determine that this asserted reason was simply a pretext for unlawful retaliation.

### 2.   Burden-Shifting Analysis

**[21]** Because we conclude that the Van Asdales have made out a prima facie showing of retaliatory termination in violation of § 1514A, IGT cannot obtain summary judgment unless it shows by clear and convincing evidence that it would have terminated the Van Asdales even absent any protected activity. 18 U.S.C. § 1514A(b)(2)(A); 49 U.S.C. § 42121(b)(2)(B). On appeal, IGT does not argue that it can satisfy this requirement. We thus hold that the district court erred in granting IGT summary judgment on the Van Asdales' Sarbanes-Oxley claim.

### C.   *State-Law Claims*

**[22]** After granting summary judgment to IGT on the Van Asdales' sole federal claim, the district court exercised its dis-

cretion under 28 U.S.C. § 1367(c)(3) and declined to retain jurisdiction over their pendant state-law claims. Because we reverse the district court's grant of summary judgment on the Sarbanes-Oxley claim, we vacate its dismissal of the Van Asdales' state-law claims and remand for reconsideration.

## III.   CONCLUSION

The Van Asdales raised a genuine issue of material fact regarding whether they were wrongfully discharged in violation of § 1514A and we reverse the district court's decision to the contrary. In light of this disposition, we vacate the district court's dismissal of the Van Asdales' state-law claims and leave it to the district court on remand to address these claims in the first instance.

REVERSED, VACATED, and REMANDED.