PERMA RESEARCH AND DEVELOP-
MENT COMPANY, Appellant,

v.

The SINGER COMPANY, Appellee.

Nos. 407 and 408, Dockets 32716
and 32754.

United States Court of Appeals
Second Circuit.

Argued Jan. 22, 1969.

Decided April 25, 1969.

Morris Chertkov, Washington, D. C., (Law Offices of Worth Rowley, Washington, D. C., Eugene J. Metzger, Washington, D. C., Steven K. Yablonski, Silver Spring, Md., on the brief; Maltese, Titone & Anastasi, New York City, of counsel), for appellant.

William C. Chanler, New York City, (Winthrop, Stimson, Putnam & Roberts, New York City, James T. Boorsch, New York City, on the brief), for appellee.

Before SMITH and HAYS, Circuit Judges, and HENDERSON, District Judge.*

---

* Chief Judge of the Western District of New York, sitting by designation.

1. The complaints in both actions alleged that Singer had shipped 500 defective units to an Ohio distributor over the express objections of Perma.

**J. JOSEPH SMITH, Circuit Judge:**

The plaintiff Perma Research & Development Company ("Perma"), brought this action for breach of contract in the United States District Court for the Southern District of New York, alleging that substantial numbers of an automobile anti-skid braking device assembled by the defendant, The Singer Company ("Singer"), were "defective due to inadequate quality control." Judge Bryan granted partial summary judgment in favor of Singer in the action for breach of contract, and dismissed an injunction action brought the same day to enjoin Singer from shipping any of the units thus assembled.[1] For the reasons stated below, we agree with the disposition of these cases, and affirm.

## I.

In June, 1964, Perma and Singer entered into a contract (the "June contract") for the manufacture of the "Perma Anti-Skid Device." Invented by Frank A. Perrino, the president of Perma, the product was said to have "a "fail-safe feature which will automatically revert to the standard braking system in case of failure."[2] By the terms of the June contract, the parties agreed that Singer would assemble the product in accordance with specifications and blue-prints provided by Perma, and that Singer would use "diligent quality control in the production, assembly, testing and packaging" of the product.

As a condition precedent to the June contract, Singer purchased an inventory of specified component parts at a cost of $1,000,000.[3] During the first few months of attempted production, Singer complained that a large number of component parts were defective in various ways, and depending on the parts in-

2. The quoted words are from the sound track of a promotional film made by Perma sometime prior to the June contract.

3. The component parts were purchased from two companies which had previously manufactured these same parts for Perma.

volved, Perma either arranged for their correction, waived the deviations, or ordered replacements. Singer also suggested modifications in the basic design of the product, and Perma responded by making some twelve design changes.[4]

In December, 1964, the parties entered into a second contract (the "December contract") which terminated the June contract[5] and assigned all patent rights on the product to Singer. In return Singer agreed to manufacture and market the product and pay royalties to Perma.[6] In addition Singer paid $24,000 in cash, gave Perma an interest-free loan of $209,000,[7] and assumed contractual obligations of Perma in the amount of $85,000. Singer also promised to pay $9,800 a month under a six-month technical services contract with Perma.

In August, 1965, Singer concluded that the product could not be made "fail-safe," and commenced a retrieval program to get back those units already on the market. At the same time Singer advised Perma that it was abandoning the project until the "fail-safe" problem could be resolved.

Perma then commenced this action for breach of the June contract. While admitting that the December contract purported to terminate the June contract, Perma alleged that Singer entered into the December contract with an intention not to perform, and asked the court to set aside the December contract on account of fraud. In the alternative, Perma asked for damages for breach of the December contract. Singer, in turn, counterclaimed for $4,000,000 on the theory that Perma had fraudulently misrepresented the "fail-safe" features of the product.

On Singer's motion for summary judgment, Judge Bryan dismissed the action to set aside the December contract on account of fraud.[8] He held that Perma failed to produce any evidence showing a fraudulent intent on the part of Singer, and further held that a fraudulent intent, even if proved, would not give rise to an action for rescission under New York law.[9] Having concluded that

---

4. Under paragraph 9 of the June contract, Singer was forbidden to make any changes in the basic design of the invention without the written approval of at least two officers of Perma.

5. Paragraph 7 of the December contract provided that the June contract "shall be deemed null and void and of no force and effect," and further provided that "all rights and obligations of the parties thereunder" shall be terminated with the exception of certain accrued items not relevant here.

6. In the event Singer did not spend at least $100,000 annually on "marketing, promoting and advertising" the product, the December contract gave Perma a "reversion right" on the payment of $50,000.

7. This was done under an arrangement whereby Singer assumed $209,000 in claims against Perma in return for which Perma gave Singer a promissory note in that amount.

8. Perma also alleged that the December contract was void on account of lack of consideration and illusoriness. In light of the statements made in the Perrino deposition, the mind boggles at the suggestion that the December contract was not supported by adequate consideration. Perrino admitted, for example, that in consideration for the December contract Singer paid $24,000 in cash, assumed an obligation of a distributor for $40,000, and paid certain of Perma's debts or assumed its liabilities to the sum of $209,967. He also admitted that Singer and Perma had continued to work together for at least six months under the technical services contract, and that Perma was paid at the monthly rate of $9,800. Equally frivolous is the argument based on illusoriness, since Singer was obligated to use its best efforts to manufacture and market the product *even if the agreement did not expressly say so.* "A promise may be lacking, and yet the whole writing may be 'instinct with an obligation' imperfectly expressed." Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214 (1917) (Cardozo, J.). Moreover, it appears from the depositions that Singer did in fact spend substantial time and money trying to perfect and market the product.

9. The December contract expressly provided it should be construed in accordance with New York law.

there was no actionable fraud, Judge Bryan dismissed the claim for breach of the June contract on the ground that any such claim was barred by the valid December contract. This left the claim for breach of the December contract, as well as the counterclaim by Singer, and as to these claims Judge Bryan denied summary judgment. He then certified that there was "no just reason for delay," and entered final judgment on the dismissed claims.[10]

On appeal Perma insists that a contractual promise made without any intention of performing it is fraudulent, and that Judge Bryan erred in holding that a contract induced by fraudulent promises could not be rescinded under New York law. In addition, Perma urges that there was a triable issue of fact on the fraud claim, and that summary judgment was improperly granted. We need not reach the summary judgment question, of course, if Judge Bryan was correct in holding that proof of an intention not to perform would not give rise to an action for rescission under New York law.

## II.

Since the New York Court of Appeals has specifically held that "a contractual promise made with the undisclosed intention not to perform it constitutes fraud," Sabo v. Delman, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718, 143 N.E. 2d 906, 909 (1957), we think that Judge Bryan erred in dismissing the fraud claim on the theory that it would not support an action for rescission. "[I]f a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of 'a material existing fact' upon which an action for rescission may be predicated." Id. at 160, 164 N.Y.S.2d at 716, 143 N.E.2d at 908.

In dismissing the fraud claim, Judge Bryan quoted approvingly from Briefstein v. P. J. Rotondo Co., 8 A.D.2d 349, 351, 187 N.Y.S.2d 866, 868 (1st Dept. 1959), where it was said: "To say that a contracting party intends when he

---

10. Since the injunction action raises the question of whether the December contract was fraudulently induced, and since dismissal of that action is unquestionably a "final decision" within the meaning of 28 U.S.C. § 1291, we need not decide whether the dismissed claims in the breach of contract action are properly appealable under Rule 54(b), Fed.R.Civ.P. The basic issue in both actions is whether the June contract was effectively terminated by the December contract, and under the circumstances, we think that a decision adjudicating the fraud issue in the injunction action would be *res judicata* in the breach of contract action. See generally 1B Moore, Federal Practice ¶ 0.405 [1] (2d ed. 1965).

By its very words Rule 54(b) is applicable only "[w]hen more than one claim for relief is presented," and thus the partial adjudication of a single claim is not appealable, regardless of whether there is a Rule 54(b) certificate. McNellis v. Merchants National Bank & Trust Company of Syracuse, 385 F.2d 916 (2d Cir. 1967). The alternative claims for breach of contract do not present multiple claims within the meaning of Rule 54(b), since Perma would be limited at best to a single recovery. See Campbell v. Westmoreland Farm, Inc., 403 F.2d 939, 941 (2d Cir. 1968). "The word 'claim' in Rule 54(b) refers to a set of facts giving rise to legal rights in the claimant, not to legal theories of recovery based upon those facts." CMAX, Inc. v. Drewry Photocolor Corp., 295 F.2d 695, 697 (9th Cir. 1961). As to whether the claim-counterclaim situation presents multiple claims, compare Omark Industries, Inc. v. Lubanko Tool Co., Inc., 266 F.2d 540 (2d Cir. 1959) ("multiple claims" presented when the plaintiff sued for goods sold and delivered and defendant counterclaimed for breach of franchise agreement), with Seaboard Machinery Corp. of Delaware v. Seaboard Machinery Corp. of New Jersey, 267 F.2d 178 (2d Cir. 1959) ("single claim" presented where all counts of complaint and counterclaim arose out of a single contract). Compare also Bendix Aviation Corp. v. Glass, 195 F.2d 267, 38 A.L.R.2d 356 (3d Cir. 1952) (*en banc*) ("multiple claims" presented where claims for specific performance and counterclaim for damages arose out of same transaction), with Carter v. Croswell, 323 F.2d 696 (5th Cir. 1963) ("single claim" presented where claim and counterclaim arose out of same automobile accident).

enters into an agreement not to be bound by it is not to state 'fraud' in an actionable area, but to state a willingness to risk paying damages for breach of contract." Judge Bryan distinguished *Sabo* on the ground that the fraud there resulted from misrepresentations as to "collateral matters" which had not been reduced to writing. Since Singer did not make any promises "outside the terms of the contract," Judge Bryan concluded that *Briefstein*, and not *Sabo*, was controlling. We disagree.

While the contract in *Sabo* may have been fraudulently induced by "collateral" promises not reduced to writing, there is nothing in the *Sabo* opinion which suggests that the result would have been any different if the fraudulent promises had been included within the actual terms of the contract itself. As a matter of plain logic, we fail to see why there is any less fraud in the inducement if the false promises are made a part of the contract itself, and indeed, *Sabo* speaks of *contractual* rather than *collateral* promises. Since *Briefstein* was not decided by the highest appellate court in New York, and since there is good reason to think that the New York Court of Appeals would not follow the somewhat aberrational holding of that case,[11] we think that *Sabo* is controlling in this diversity action, see Commissioner of Internal Revenue v. Bosch's Estate, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), and hold that Judge Bryan erred in dismissing the fraud claim on the basis of *Briefstein*.

## III.

Having concluded that the fraud alleged here, if true, would support an action for rescission, we must decide whether Judge Bryan was correct in holding that there were no triable issues of fact on the fraud claim. We agree that the fraud claim is without any substance, and affirm on this ground.

■■ The only allegation of fraud in the entire Perma complaint is the statement that the December contract "was procured by fraud and misrepresentations on the part of [Singer] and its agents as to its intentions and ability to market said product." By itself this allegation is plainly insufficient to state a claim for fraud under Rule 9(b), Fed. R.Civ.P.[12] Nor does the deposition of Perrino, the president of Perma, provide any factual basis for the fraud alleged in the complaint. Except for repeated references to Singer's unsatisfactory performance under the December contract, Perrino was unable to point to any evidence of an intention not to perform, and as Judge Bryan properly observed, actionable fraud depends on more than a showing of non-performance. See Restatement, Torts § 530, comment c; Restatement, Contracts § 470, comment e; Adams v. Clark, 239 N.Y. 403, 410, 146 N.E. 642 (1925). Moreover, it appears from the deposition that there was substantial performance under the December contract, at least until Singer concluded that the product was not "fail-safe" and hence unmarketable. Indeed, Perrino admitted in his deposition that the parties

11. The *Briefstein* rationale is not supported, for example, by either the Restatement of Contracts or the Restatement of Torts. See Restatement, Contracts § 473: "A contractual promise made with the undisclosed intention of not performing it is fraud." See also Restatement, Torts § 530, comment c, which provides in pertinent part: "One who fraudulently misrepresents himself as intending to perform an agreement which he makes with the recipient of the misrepresentation, is subject to liability * * * whether the agreement is enforceable or unenforceable as a contract."

12. Rule 9(b) provides that the circumstances constituting the alleged fraud must be stated with particularity. Failure to comply with Rule 9(b) will render the pleadings vulnerable to a motion to dismiss for failure to state a claim, see, for example, Robison v. Caster, 356 F.2d 924 (7th Cir. 1966), or a motion for a more definite statement. See, for example, Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 774 (D.Col.1964); Lynn v. Valentine, 19 F.R.D. 250 (S.D. N.Y.1956).

were engaged in joint efforts to solve the "fail-safe" problem as late as six months after the December contract was negotiated.

The only difficult question is whether any of the statements made by Perrino in an affidavit opposing summary judgment are sufficient to raise material issues of fact. In that affidavit Perrino said:

At the time I entered into the contract of December 21, 1964 on behalf of Perma with Singer, Perma was in desperate financial straits because of the delays in deliveries of the product under the June contract. *Mr. Kloby of Singer told me that Singer was waiting for Perma to become insolvent so that they could take over the rights to manufacture and market the product under the most satisfactory conditions or get out of their obligations to Perma entirely.* Mr. Peacock, of counsel for Singer, told me, at the time of the negotiations for the December contract, in the presence of Mr. Kloby, that Singer had every intention to manufacture and market the product and pay royalties to Perma. The Singer name was of great importance to Perma, *but I have since learned that the same Mr. Peacock had already drawn a draft agreement to sell the marketing rights to Monitor Enterprises of Long Island, New York, under an agreement whereby Perma would receive no royalties.* Also, subsequent to the signing of the December contract *I had a conversation with Mr. Person of Singer at the Biltmore Hotel in Providence, Rhode Island, at which time Mr. Person told me that Singer never had any intention of performing the December contract,* that Singer's New York management was now afraid of product liability and Singer did not want to be in the brake business, and would allow the contract to expire on the reversion date. [Italics added.]

Since Perma has fully performed all of its obligations under the December contract, Singer would be obligated to make royalty payments even if Perma became insolvent, and thus we fail to see how the statement attributed to Kloby raises any triable issue of fraud. We also note that Kloby was deposed for over 300 pages by plaintiff's counsel and was never asked about the statement which Perrino now attributes to him.

Similarly, there is no substance to the suggestion that Perma would be cheated out of royalties due under the December contract if Singer sold its marketing rights to Monitor Enterprises, Inc. The December contract expressly provides that Singer shall have "absolute discretion" in determining "the method of manufacturing, exploiting and marketing the product," and thus it would seem that Singer is obligated to pay royalties regardless of how it markets the product. Assuming that Singer did in fact arrange to sell the marketing rights to Monitor, we simply cannot say that raises any triable issue of fraud.

Finally, Perrino states that he was told by Person of Singer that "Singer never had any intention of performing the December contract." This statement is alleged to have been made sometime after the parties entered into the December contract. While it would appear to raise a triable issue as to fraudulent intent, we think that Judge Bryan could properly conclude that the statement made in the affidavit was less reliable than the contradictory statements in the deposition, see 6 Moore, Federal Practice ¶ 56.22[1] at 2814 (2d ed. 1965), and that it did not raise a triable issue of fraud.

At the time of his deposition Perrino was able to point only to Singer's alleged failure to perform as evidence of its supposed intention not to perform. At one point in the deposition he said: "There is no way of me knowing exactly what their intention was at the time they said it, except that they promised certain things when everything else points to the fact that they did not intend to do what they said they were going to do." Moreover, Perrino admitted in his deposition that there had been substantial performance under the December contract, and

this is not contradicted by the affidavit. If there is any dispute as to the material facts, it is only because of inconsistent statements made by Perrino the deponent and Perrino the affiant. "The deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination. Nevertheless, if a witness has made an affidavit and his deposition has also been taken, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question whether there is any genuine issue as to any material fact." 6 Moore, Federal Practice ¶ 56.22[1] at 2814 (2d ed. 1965).

■ During four days of deposition-taking Perrino was repeatedly asked to specify the basis of the fraud he alleged, and we think it is significant that he made no reference to the alleged conversation with Person when Singer might have had an opportunity to cross-examine him about it. We think it is also significant that Perma's lawyers failed to question Person about the alleged conversation when they examined him on deposition. Since Perrino was admittedly a party to that conversation, this is plainly not a case where the party opposing summary judgment can complain of non-access to material facts. See Rule 56(f), Fed.R.Civ.P. Nor is this a case where the contradicting affidavit can fairly be said to contain evidence "newly discovered." If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. Cf. Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964). Compare Engl v. Aetna Life Insurance Co., 139 F.2d 469 (2d Cir. 1943), where Judge Clark observed that a party who resists summary judgment cannot hold back his evidence until the time of trial.

■ The object of summary judgment is "to discover whether one side has no real support for its version of the facts," Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494, 498 (2d Cir. 1962), and thereby to avoid unnecessary trials. We recognize that summary judgment was never intended to be a substitute for trial by jury where the parties "really have issues to try." Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 621, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944). We recognize also that there may be some instances where summary judgment is too blunt a procedural device for deciding difficult cases. See, for example, Miller v. General Outdoor Advertising Co., 337 F.2d 944 (2d Cir. 1964). Nonetheless, summary judgment cannot be defeated by the vague hope that something may turn up at trial. Radio City Music Hall Corp. v. United States, 135 F.2d 715 (2d Cir. 1943). Since neither the Perrino deposition nor the Perrino affidavit raises any issue which we can call genuine, and since the allegations of fraud amount to little more than allegations on non-performance, we hold that Judge Bryan properly granted summary judgment dismissing the fraud claims.

IV.

As a separate ground for reversal Perma urges that Judge Bryan erred in admitting the affidavit of Singer's counsel in support of its motion for summary judgment. The affidavit was made by William C. Chanler, and it was basically an attempt to summarize over 1,000 pages of depositions, as well as numerous documentary exhibits. Perma now insists that the affidavit contains "a substantial number of important misstatements and misconstructions," that it was based on hearsay as to which Chanler was not competent to testify, and that it was not made on personal knowledge as required under Rule 56(e), Fed.R.Civ.P.

■ While it is true that there are certain statements which do not appear to be made on personal knowledge and which are hence inadmissible,[13] see Union

---

13. At one point, for example, Chanler stated in his affidavit that there was O-ring leakage in a pressure switch component and that this resulted from "a

Insurance Society of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946, 952 (2d Cir. 1965), we think that Judge Bryan could have properly disregarded these statements, especially since none is relevant to the question of whether the December contract was obtained by fraud. "Even if an affidavit does contain some inadmissible matter, the whole affidavit need not be stricken or disregarded; the court may disregard the inadmissible parts and consider the rest of the affidavit." 6 Moore, Federal Practice ¶ 56.22 [1] at 2817 (2d ed. 1965).

We also note that the motion to strike was much too general in that it did not specify which parts of the Chanler affidavit should be stricken and why. Many of the statements made in the Chanler affidavit were amply supported by the record, and we think that the plaintiff was required to do more than swing its bludgeon wildly. As Prof. Moore has said, the motion to strike must be precise. "[I]t should state specifically the portions of the affidavit to which objection is being made, and the grounds therefor." 6 Moore, Federal Practice ¶ 56.22[1] at 2818 (2d ed. 1965).

The judgments are affirmed.

basic design defect in the angle of the cylinder entrance through which the O-rings were inserted." From the deposi-tions it is somewhat unclear whether this malfunction could properly be called "a basic design defect."