# IN THE SUPREME COURT OF IOWA

No. 17–0908

Filed March 12, 2020

**SHARON K. SUSIE** and **LARRY D. SUSIE,**

Appellants,

vs.

**FAMILY HEALTH CARE OF SIOUXLAND, P.L.C.** d/b/a **FAMILY HEALTH CARE OF SIOUXLAND URGENT CARE** and **SARA HARTY,**

Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.

Defendants seek further review of a court of appeals decision reversing the district court's grant of summary judgment. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Marc A. Humphrey of Humphrey Law Firm, P.C., Des Moines, for appellants.

Kellen B. Bubach, Jack D. Hilmes, and Erik P. Bergeland, of Finley Law Firm, P.C., Des Moines, for appellees.

**CHRISTENSEN, Chief Justice.**

The lead plaintiff in this case tragically lost an arm and toes due to a rare, but extremely serious, disorder known as necrotizing fasciitis. We must decide whether the district court was correct in granting defendants' motion for summary judgment on plaintiffs' medical malpractice claims. On direct appeal, the court of appeals reversed the district court's judgment. Upon further review, we vacate the decision of the court of appeals and affirm the district court's judgment. Because the plaintiffs failed to set forth specific facts showing a prima facie case of causation and lost chance of survival, we affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Sharon Susie fell in her living room, injuring her right arm. Her arm was bruised and painful. The condition of her arm did not improve. Approximately one week later, on September 29, 2012, she went to the urgent care clinic of Family Health Care of Siouxland and was treated by Sara Harty, a physician's assistant. Harty ordered an x-ray of Sharon's arm, which revealed "no fractures or dislocations" but there was "moderate soft tissue swelling about the elbow joint dorsally." Harty diagnosed Sharon with right proximal forearm pain, elbow pain, and a right elbow contusion. A shot for pain and prescription pain killers were provided to Sharon. Harty instructed Sharon to ice her arm and told her to follow up with her doctor if she was not better in two days.

The next day, Sharon's adult son found her extremely ill. Sharon was taken to Mercy Medical Center in Sioux City where she was diagnosed with septic shock and kidney failure. She was immediately placed on antibiotics, but her condition continued to deteriorate. The biopsy of Sharon's right arm showed she had necrotizing fasciitis, also known as a flesh-eating disease. To stop the progression of the life-threatening

disease, doctors amputated Sharon's right arm. As a result of medication that directed blood flow to her vital organs, eight of Sharon's toes were amputated as well.

Two years later, Sharon and her husband (Susies) filed a negligence action against Family Health Care of Siouxland and Harty (defendants), seeking damages for the amputation of her right arm and other related injuries. The Susies alleged defendants were negligent because Sharon's condition was not properly diagnosed and treatment was not timely commenced, requiring amputation of her right arm. Later, the Susies also alleged defendants' actions resulted in the lost chance to save Sharon's arm and toes from amputation. The Susies originally designated Dr. John Crew as their expert witness, and he was deposed. However, Dr. Crew died prior to trial. On April 11, 2017, the Susies designated Dr. Roger Schechter to substitute for Dr. Crew and submitted a signed report summarizing Dr. Schechter's opinions pursuant to Iowa Rule of Civil Procedure 1.508. The report stated, in part,

> Dr. Schechter will also opine to a reasonable degree of medical probability regarding the treatability of Sharon Susie's infection at the point of time she presented to the urgent care clinic on September 29, 2012. He is also expected to testify that had the infection been diagnosed on the day of her visit to the clinic, and treatment initiated immediately, the spread of the infection, more likely than not, could have been avoided, the infection would not have become systemic; and the amputation of Sharon's arm and toes would more likely than not have been avoided.

Two weeks later, on April 25, 2017, Dr. Schechter was deposed. Following Dr. Schechter's deposition, defendants filed a motion for summary judgment, arguing the Susies lacked any evidence on causation and that Dr. Schechter could only provide speculation as to the effect of antibiotic administration. The Susies resisted the motion, stating a prima facie case on causation was made by considering all of the evidence,

including Dr. Schechter's 1.508 report, his deposition testimony, and the supporting evidence from multiple medical providers. On May 8, a hearing was held on the motion for summary judgment. The district court stated on the record as follows:

> Okay. It's clear to me even -- and I know, Mr. Humphrey, you wanted to make sure I read all of your other physician stuff. I did that. I still believe and I find that there is no -- that you don't have the necessary expert more likely than not causation evidence to get the claim to a jury.
>
> Now, Schechter, every time he was really forced or asked the major question, he said speculation, I don't know what the outcome would have been, may have made a difference. I don't care what's in his 1.508 because when you're asked under oath in a deposition, are these your final opinions, he's stuck with those. And he didn't give more likely than not in his deposition.
>
> Your plaintiff's treating physicians basically said, listen, the earlier you get antibiotics, the better chance you have. What's the other phrase? Time is tissue. Lamptey said it may well stop it from progressing. Rizk says, well, if you get antibiotics early, they usually work. Let's see. Where's the other one? Earlier the antibiotics, better likely the outcome for the patient. I think all your treaters said that.
>
> The problem is -- with that is they did not give an opinion in this case with these facts whether or not it would have made a difference. What it does normally doesn't push you over the line.

The district court granted defendants' motion for summary judgment. The Susies appealed. We transferred the case to the court of appeals. The court of appeals reversed the judgment of the district court, concluding the grant of summary judgment was improper. The court of appeals looked "at all of the evidence presented," and when "taken together, indicate the probability or likelihood of a causal connection between defendants' failure to administer antibiotics on September 29, 2012, and the injury to Sharon." The defendants applied for further

review, and we granted their application. We will discuss additional facts as necessary.

## II. Standard of Review.

We review the grant of summary judgment for correction of errors at law. *Konrardy v. Vincent Angerer Tr., Dated Mar. 27, 1998*, 925 N.W.2d 620, 623 (Iowa 2019). Summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Iowa R. Civ. P. 1.981(3). The burden is on the moving party to demonstrate the nonexistence of a material fact question. *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 545 (Iowa 2018). However, the nonmoving party may not rely on mere allegations in the pleadings but must set forth specific facts showing a genuine issue for trial. *Id.*; *accord* Iowa R. Civ. P. 1.981(5). If the nonmoving party cannot generate a prima facie case in the summary judgment record, the moving party is entitled to judgment as a matter of law. *See Robinson v. Poured Walls of Iowa, Inc.*, 553 N.W.2d 873, 875, 878 (Iowa 1996).

We view the facts in the light most favorable to the nonmoving party. *Konrardy*, 925 N.W.2d at 623. "But the proof in any case must be such that the fact finder is not left to speculate about who the negligent culprit is." *Walls v. Jacob N. Printing Co.*, 618 N.W.2d 282, 284 (Iowa 2000) (en banc). Thus, "[s]peculation is not sufficient to generate a genuine issue of fact." *Hlubek v. Pelecky*, 701 N.W.2d 93, 96 (Iowa 2005).

## III. Analysis.

On further review, the defendants present two claims. First, they argue the district court correctly held there was insufficient evidence of

but-for causation. Second, the defendants maintain there was insufficient evidence to support a claim of lost chance of survival.

**A. But-For Causation.** Defendants contend there was insufficient evidence of but-for causation. A prima facie case of medical negligence requires plaintiff to establish the applicable standard of care, a violation of that standard, and a causal relationship between the violation and the injury. *Eisenhauer ex rel. Conservatorship of T.D. v. Henry Cty. Health Ctr.*, 935 N.W.2d 1, 9 (Iowa 2019). The central causation question for Susies' claims is whether it was more likely than not that Sharon's arm would have been saved by administration of antibiotics on September 29, 2012. Expert testimony is required to create a jury question on causation when the causal connection "is not within the knowledge and experience of an ordinary layperson." *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 793 (Iowa 2009). The parties agreed expert testimony was necessary to establish causation in this case.

Defendants point out Dr. Schechter's testimony failed to establish the causation element of Susies' prima facie case. We agree with this assertion. Dr. Schechter's testimony does not rise above the level of speculation. To begin, it is unclear whether Dr. Schechter is qualified to render a causation opinion. He testified he is not an expert in the treatment of necrotizing fasciitis and he is not a surgeon nor an infectious disease specialist. Regardless, Dr. Schechter was unable to provide the causal link between defendants' alleged violation of the standard of care and Sharon's injuries:

> Q. Or are you here to say that Sharon Susie's arm was cut off because of Sara Harty? A. I'm not here to say her arm was cut off because of Sara Harty. I'm here to say that she became ill and septic because she wasn't given a thorough enough evaluation and followup.

Q. Isn't the bottom line, you don't know what would have happened to Sharon Susie had she had CBC testing, had she returned to the clinic in 20 hours or less than 24 hours, had a comprehensive physical exam been documented? You don't know that the outcome would not have been exactly the same. True? A. I don't know, but the faster you get to care when you're sick, the better off you are.

. . . .

Q. Well, if she had a firestorm brewing when she walked into the urgent care clinic, as Dr. Crew said, Dr. Crew telling us that she has the beginnings of necrotizing soft tissue disease then and there, do you think -- do you really think Sara Harty can stop that? A. I think Sara Harty could have gotten through instructing this patient who was clearly ill throughout the night -- if she had been instructed that should she have all these untoward symptoms of any kind -- and it's -- it's generic. It's not specific necrotizing fasciitis. It's generic to physical deterioration and infection regardless.

If she were given the appropriate instructions and her husband had the instruction, she -- which would state in this situation "Go to the ER," she would have gotten to the ER sooner. And it's speculative, but clearly time is of the essence when you're getting progressively more ill.

Dr. Schechter was noncommittal about whether antibiotics would have been effective if administered when Harty first saw Sharon:

Q. At the same page, our discussion continues where [Dr. Crew] agreed to the possibility that because it would take 36 hours for the antibiotics to be effective, Sharon Susie would still go to Mercy in the condition that she was because the antibiotics had not had time to work. That's Page 48 of his deposition.

Do you remember that discussion? A. Yes.

Q. You agree with that possibility; correct? A. Possibility.

Q. He said in that same page range: "It is speculation on whether the antibiotics would," quote, " 'turndown,' " close quote, "the infection had they been given by Sara Harty." Do you agree? A. Speculation, yes.

Dr. Schechter admitted, given the sparseness of the documentation, it was unclear whether Sharon should have been given antibiotics immediately:

> Q. So what you're saying from the record and the lack of the CBC, you don't think she necessarily had enough information to make that next step in prescribing antibiotics? A. Well, from the record and the sparseness of the documentation, I don't have enough information either.
>
> Q. Okay. So that's -- we're saying the same thing. A. Right.
>
> Q. Stated another way, you don't have enough information to say whether she should have given antibiotics or not in the circumstances; is that right? A. Correct.

He even conceded the effect of antibiotics on Sharon's outcome was "speculative":

> Q. What I'm getting to, we are speculating on the effect of antibiotics had they been given to Sharon Susie on the afternoon of the 29th of September 2012; correct? A. Yes.

When asked the ultimate but-for causation question by Susie's own counsel, Dr. Schechter provided this cryptic response:

> Q. Do you agree with that -- that the earlier you get the antibiotics on board and the more you allow the body to mobilize in someone's immune system in response to this developing infection that you may well more likely than not have saved her arm?
>
> . . . .
>
> A. To -- I would say it's a significant possibility ranging as high as probability that early intervention with antibiotics could have either at least reduced the progression of the infection or slowed its progression and potentially have averted as much tissue loss as she experienced.

The opinions by Dr. Schechter provide no guidance for the jury on how or if Sharon's outcome would have been different if antibiotics were administered one day earlier. While an expert is not required to express

an opinion with absolute certainty, *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 688 (Iowa 2010), Dr. Schechter provides only speculative and confusing testimony on causation. The jury cannot be left to speculate about the but-for causal link. *See Hlubek*, 701 N.W.2d at 96.

The Susies rely on Dr. Schechter's 1.508 report for the contention that a causal link exists between defendants' failure to administer antibiotics on September 29, 2012, and Sharon's injury. The report indicated Dr. Schechter would testify that had Sharon's infection been treated immediately on the day of her visit to the clinic, "the amputation of Sharon's arm and toes would more likely than not been avoided." However, in his deposition, Dr. Schechter contradicted his 1.508 report by testifying that the causal connection was speculative. In *Estate of Gray ex rel. Gray v. Baldi*, we adopted the "contradictory affidavit rule." 880 N.W.2d 451, 463 (Iowa 2016). Under this rule, we will reject an affidavit that directly contradicts prior testimony unless the affiant provides a reasonable explanation for the apparent contradiction. *Id.* at 462–63. To invoke the contradictory affidavit rule, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous." *Id.* at 464 (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)).

The circumstances presented here are somewhat different from *Baldi*. Assuming Dr. Schechter's signed 1.508 report is part of the summary judgment record, the sequence is reversed—the deposition testimony came after the 1.508 report. But the timing of the report is inconsequential. *See Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C.), *aff'd*, No. 11–5144, 2011 WL 6759550, at *1 (D.C. Cir. Dec. 8, 2011) (per curiam). There is "no principle that cabins sham affidavits to a particular sequence." *In re CitX Corp.*, 448 F.3d 672, 679 (3d Cir. 2006). The essence

of this rule is that there is no genuine issue of fact because the deposition testimony precludes consideration of contradictory affidavits. *See Baldi*, 880 N.W.2d at 463–64. Accordingly, Dr. Schechter's expert report, which he contradicted at his deposition, is insufficient to generate a genuine issue of fact.

The defendants also claim the testimony of Susies' medical providers is insufficient to generate a causal fact issue. "[T]he 'probability' of causal connection necessary to generate a jury question need not come solely from one witness." *Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 747 (Iowa 1977). Susies presented supporting testimony from Dr. Daniel Lamptey, an infectious disease specialist; Dr. William Rizk, a general surgeon; and Dr. Ravi Vemuri, an infectious disease specialist. Yet, the record testimony of the medical providers is not relevant to the causal link.

The earlier-is-better testimony is insufficient to create a genuine issue of material fact. According to Dr. Lamptey, "the sooner you can see a patient with an infectious condition and start the antibiotics, the better the likelihood you can have some impact on the progression of this disease into something more serious." Dr. Rizk made a similar point, agreeing that "time equals tissue; meaning the longer it's allowed to progress, the more tissue you're going to have to remove to save the patient's life" when dealing with necrotizing fasciitis. Dr. Vemuri also agreed that "generally speaking the earlier an infection is diagnosed and the earlier an appropriate antibiotic is prescribed, the better the likely outcome for the patient." Not one witness opined that the immediate administration of antibiotics on September 29, 2012, would have more likely than not avoided the injury to Sharon.

Susies failed to establish a prima facie case of causation. There is only speculative testimony in the record from which a jury could infer it

was more likely than not that Sharon's arm would have been saved by administration of antibiotics on September 29, 2012.

**B. Lost Chance of Survival.** The lost-chance-of-survival doctrine is a compensable event where "a personal representative may recover damages for a lost chance of survival as an alternative to a traditional wrongful-death recovery." *Mead v. Adrian*, 670 N.W.2d 174, 178 (Iowa 2003). Expert testimony is required to show the "defendant *probably* caused a reduction in [the plaintiff's] chance of survival." *DeBurkarte v. Louvar*, 393 N.W.2d 131, 137–38 (Iowa 1986) (en banc). We have recognized in medical malpractice cases that the amount of damages for a lost chance of survival is "the percent of lost chance attributed to the intervening act of negligence." *Mead*, 670 N.W.2d at 178–79 (quoting *Wendland v. Sparks*, 574 N.W.2d 327, 331 (Iowa 1998)).

Susies' resistance to defendants' motion for summary judgment asserts Sharon lost her best chance to save her arm and toes due to Harty's failure to administer antibiotics. Defendants argue Susies cannot generate a prima facie case of lost chance of survival. We agree with defendants' position. No expert witness has provided testimony that Sharon lost any chance to save her arm or toes.

Further, no witness has testified that it was even possible for Sharon's arm to be saved by the administration of antibiotics on September 29, 2012. Susies' brief points to the testimony of Dr. Schechter and Jeffrey Nicholson for the position that failure to administer antibiotics resulted in tissue damage to Sharon. However, the "time is tissue" and "sooner is better" expressions are not lost-chance theories.

The question central to Susies' lost-chance claim is what chance of keeping her arm and toes did Sharon lose as a result of a one-day delay in the administration of antibiotics. No witness opined what the chance of

Sharon keeping her arm and toes was, if any, had antibiotics been administered when she visited Harty.

Therefore, Susies failed to establish a prima facie case of lost chance on the summary judgment record. There is no expert testimony from which a jury could decide what the reduction in Susies' chance of survival was. The jury cannot be left to speculate about the lost chance of survival. *See Walls*, 618 N.W.2d at 284.

**IV. Conclusion.**

Because Susies failed to set forth specific facts showing a prima facie case of causation and lost chance of survival, we affirm the district court's grant of summary judgment.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, J., who dissents, and McDonald and Oxley, JJ., who take no part.

#17–0908, *Susie v. Family Health Care of Siouxland, P.L.C.*

**APPEL, Justice (dissenting).**

The majority decides this case on the basis of the contradictory affidavit rule. The rule generally stands for the proposition that an affidavit submitted by an interested party in opposition to a motion for summary judgment may be disregarded if it materially contradicts the affiant's prior deposition testimony. Before cutting and pasting the contradictory affidavit rule into this case, however, exploration of the development of the rule, the nuances in the rule, and the nature of its application in caselaw will illuminate the choices we face in deciding the issue presented in this case. A larger review of the substance of the rule compels me to respectfully dissent.

**I. Overview of Contradictory Affidavit Rule.**

**A. Introduction: Chainsaw or Scalpel.** The contradictory affidavit rule has been controversial. It is not based upon any rule of civil procedure and is contrary to the traditional approach in the courts to summary judgment applied over decades of jurisprudence. It has not been explicitly embraced by the United States Supreme Court. It has, however, gained a foothold in the lower federal courts and, to a somewhat lesser extent, in state courts.

In determining its scope and in considering whether to adopt the rule, there are competing considerations. On the one hand, a self-serving affidavit manufactured by an interested party to defeat summary judgment after potential flaws in the case have been exposed may be so egregious that the magic affidavit should not be allowed to generate a genuine issue of material fact. Yet on the other hand, determinations of credibility of witnesses is a core jury function at the very heart of the constitutional right to a jury trial. Because of the very important jury trial implications,

the contradictory affidavit rule is generally sparingly and narrowly applied. For the most part, the rule is highly qualified, subject to a series of limitations, and used as a scalpel, not a chainsaw.

**B. Developments in Federal Courts.** The Seventh Amendment to the United States Constitution guarantees the right to a jury trial. The traditional approach has been that when a party contradicts prior testimony that gives rise to a matter of credibility, it is for the jury to evaluate and determine. Such an approach gave breathing room to the fundamental right to a jury trial.

In the minds of some, however, pragmatic considerations toward the end of the twentieth century arose that tended to press the constitutional barriers. Judicial innovators feared that if last-minute, sham affidavits raised jury questions, the utility of the rules providing for summary judgment would be undermined.

The contradictory affidavit rule was discovered relatively recently in *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969). In this case, the president of the corporate plaintiff stated in his deposition that he could provide no particularized evidence of the defendant's fraudulent intent. *Id.* at 576–77. The president then filed an affidavit when the defendant moved for summary judgment, claiming that the defendant's president told him that the defendant corporation never had any intention of performing on the contract. *Id.* at 577.

The *Perma Research* court found that

> [i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Id.* at 578.

Similarly, in *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir. 1975), the United States Court of Appeals for the Ninth Circuit considered

> the question of whether contradictory testimony of a plaintiff alone can be used by him to defeat a defendant's summary judgment motion where the only issue of fact results from the necessity of choosing between the plaintiff's two conflicting versions.

*Id.* at 543–44. Citing *Perma Research*, the *Radobenko* court in a few lines determined that the issues of fact were created by Radobenko and were not genuine. *Id.* at 544. In order to exclude the testimony, however, the court embarked on a two-part test: first, does a contradiction exist, and if so, second, whether the contradiction is justified. *Id.*; *see also Estate of Gray ex rel. Gray v. Baldi*, 880 N.W.2d 451, 462–64 (Iowa 2016). As a result, the *Radobenko* court determined that the district court properly granted summary judgment in favor of the defendant. *Radobenko*, 520 N.W.2d at 544.

After *Perma Research* and *Radobenko*, many federal courts adopted some version of the contradictory affidavit rule. *See, e.g.*, *Darnell v. Target Stores*, 16 F.3d 174, 176–77 (7th Cir. 1994), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013); *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 706 (3d Cir. 1988); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657–59 (11th Cir. 1984). The spread of the rule did not happen without a good fight. *See Van T. Junkins & Assocs., Inc.*, 736 F.2d at 660 (Johnson, J., dissenting) (criticizing the doctrine as unduly invading the role of the jury); *Gross v. S. Ry.*, 414 F.2d 292, 297 (5th Cir. 1969) (noting it is "well settled that in considering a motion for summary judgment, the court has no duty or function to try or decide factual issues"); *Olin v. Disneyland Int'l*, 832 F.

Supp. 1342, 1344 (D. Ariz. 1993) (observing that trial judges should not be required "to choose among competing or conflicting inferences or to pass on the credibility of witnesses with differing versions of material facts"). As the contradictory affidavit rule began to take hold, however, some cases seemed to imply that offsetting affidavits could never be considered in summary judgment motions. *See, e.g.*, *Jones v. Gen. Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991) ("[I]t is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition."); *see also* Collin J. Cox, Note, *Reconsidering the Sham Affidavit Doctrine*, 50 Duke L.J. 261, 269–70 (2000) [hereinafter Cox, *Sham Affidavit*] (exploring the tension between the *Perma Research* approach and caselaw barring offsetting affidavits in summary judgment motions). Most of the evolving caselaw, however, mindful of the powerful traditional notion that credibility issues are ordinarily for the jury, tended to emphasize its limited and narrow character to dampen the bite of the contradictory affidavit rule.

A significant number of cases offer generalized admonitions about the use of the contradictory affidavit rule. For instance, many cases emphasize that the rule should be applied "with great caution." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996); *see also Taylor v. ScottPolar Corp.*, 995 F. Supp. 1072, 1075 n.2 (D. Ariz. 1998). This general directive that the contradictory affidavit rule should be cautiously applied has been translated into discrete limitations.

For example, it is often stated in stark terms that in order to invoke the contradictory affidavit rule, the affidavit offered must "directly" or "flatly" conflict with the prior deposition testimony. Two influential federal cases embracing this limitation are *Kennett-Murray Corp. v. Bone*, 622 F.2d

887 (5th Cir. 1980), and *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir. 1986).

In *Kennett-Murray*, a plaintiff employer brought a claim against a former employee seeking recovery on a promissory note and an employment contract. 622 F.2d at 889. The Fifth Circuit held that a party's affidavit cannot be disregarded "merely because it conflicts to some degree with an earlier deposition." *Id.* at 893. The Fifth Circuit observed that "a genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony in the party's deposition." *Id.* The Fifth Circuit declared that the contradictory affidavit rule should be applied only where the affidavit is "clearly" or "blatantly" inconsistent. *Id.*

The Eleventh Circuit took a similar approach to the contradictory affidavit rule in *Tippens*. In *Tippens*, the court noted that "[a] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." 805 F.2d at 953. According to *Tippens*, the contradictory affidavit rule applies only in "the type of irreconcilable conflict that amounts to a transparent sham which should be disregarded." *Id.* at 955; *see Lowie v. Raymark Indus.*, 676 F. Supp. 1214, 1217 (S.D. Ga. 1987) (citing *Tippens* in making the distinction between statements that are merely inconsistent with those that are contradictory). As noted in *Fustok v. Conticommodity Servs., Inc.*, 577 F. Supp. 852, 859 n.30 (S.D.N.Y. 1984), "instances in which the assertions in an affidavit are so blatantly contradictory of those in a prior deposition that the affidavit must be disregarded" are "rare."

Even where the statements are blatantly contradictory, the contradictory affidavit rule is not automatically applied. A number of courts have held that a plausible explanation for a contradiction is

sufficient to avoid the application of the contradictory affidavit rule. *See, e.g., Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.), *amended*, 169 F.3d 782 (2d Cir. 1998); *Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654, 660 (N.D. Cal. 1994). And "[o]bviously, a plausible showing would require considerably less than would a probable one." *State v. Vargas*, 704 P.2d 125, 129 (Or. Ct. App. 1985).

There is also a question of whether the contradictory affidavit rule should be limited only to affidavits of interested parties. For example, in *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009), the Ninth Circuit declared that the rule does not apply to third parties. Similarly, in *Lane v. Celotex Corp.*, 782 F.2d 1526, 1531 (11th Cir. 1986), the Eleventh Circuit stated, "[W]e would be unable, absent great trepidation, to affirm a similar finding with respect to a disinterested *witness'* contradictory affidavit." But in *Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 521 (7th Cir. 1988), the court noted that while the contradictory affidavit rule generally applied only to parties, there was no reason why the rule should not be extended to a party's experts.

Finally, there is a question of timing. The contradictory affidavit rule is usually employed where an affidavit is produced at the last minute to avoid summary judgment after the witness has made contradictory statements in a prior deposition. The circumstances are described as suspicious when a contradictory affidavit magically appears at the last minute after an extensive deposition has been taken of the party in order to defeat summary judgment. *See, e.g., Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006); *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 5 (1st Cir. 1994).

The question is whether the reverse is true, where a deposition contradicts a prior statement made in a case. Where the deposition has been taken at the request of the opposing party, the statements made at the deposition seem less likely to be a sham than when a last-minute statement is prepared by the party seeking to avoid summary judgment.

But, as pointed out by the majority, there are two federal courts that have adopted this approach: The D.C. Circuit in *Glass v. Lahood*, 786 F. Supp. 2d 189, 215–16 (D.D.C.), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011), and the Third Circuit in *In re CitX Corp., Inc.*, 448 F.3d 672, 679–80 (3d Cir. 2006). Yet, while the contradictory affidavit rule may be applicable in this setting, where the deposition has been taken at the request of an opposing party, the most recent statements do not quite have the same suspicious timing.

**C. State Court Approaches.** While the trend in federal courts embrace some form of the contradictory affidavit rule, there is no requirement that state courts follow a similar path. Indeed, many state courts, including Iowa, have declined to follow *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). *See Hawkeye Foodservice Distribution, Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 608 (Iowa 2012) (declining to follow *Twombly* and *Iqbal* under Iowa law); Zachary D. Clopton, *Procedural Retrenchment and the States*, 106 Calif. L. Rev. 411, 425 (2018) (noting Iowa, along with eighteen other states, have expressly rejected plausibility pleading). While we may look to federal precedent for its persuasive power, we are free to chart our own path.

While the majority of state courts have endorsed some version of the contradictory affidavit rule, the state courts have generally been somewhat less enthusiastic about adoption of the contradictory affidavit rule. *See,*

*e.g.*, Randy Wilson, *The Sham Affidavit Doctrine in Texas,* 66 Tex. B. J. 962, 964–65 (Dec. 2003) (outlining the Texas Supreme Court standard and adoption of the sham affidavit doctrine in federal court and elsewhere).  A number of states adopted their version of the rule over strong dissents that generally emphasize the role of juries in determining credibility of witnesses.  *See, e.g., Gaboury v. Ir. Rd. Grace Brethren, Inc.*, 446 N.E.2d 1310, 1316–17 (Ind. 1983) (Hunter, J., dissenting); *Yahnke v. Carson*, 613 N.W.2d 102, 109 (Wis. 2000) (Bablitch, J., dissenting).

Several states have rejected the rule outright in favor of the traditional view that credibility determinations are for the jury, not the judge. *See Junkins v. Slender Woman, Inc.*, 386 N.E.2d 789, 790 (Mass. App. Ct. 1979) ("[I]t is sufficient that the plaintiff's later affidavit, if believed, indicated that the contrary is true."); *Delzer v. United Bank of Bismark,* 484 N.W.2d 502, 508 (N.D. 1992) (requiring consideration of all affidavits, interrogatories, etc. in the light most favorable to the opponent of summary judgment, but noting that there are certainly cases where contradictions in a party's discovery testimony will result in summary judgment because they are so extreme or far-fetched as to be unbelievable); *Pierce v. Riggs,* 540 A.2d 655, 656–57 (Vt. 1987) (finding the rationale behind the contradictory affidavit rule unpersuasive).  The case against application of the contradictory affidavit rule was also well made in *Pittman v. Atlantic Realty Co.,* 754 A.2d 1030 (Md. 2000), which emphasized that the contradictory affidavit rule

> shift[s] the credibility determination from the trier of fact at trial, where the trier of fact would have the benefit of observing the witness's demeanor on cross-examination, to the trial court on summary judgment, where the trial court would be limited to a paper record.

*Id.* at 1045.

Like the federal cases, however, many state court cases that ultimately embraced the contradictory affidavit rule have emphasized its narrowness. For example, in *Henderson-Rubio v. May Dep't Stores Co.*, 632 P.2d 1289, 1295 n.6 (Or. Ct. App. 1981), an Oregon appellate court applied the contradictory affidavit rule where the two statements were clearly inconsistent and no attempt was made to explain the inconsistency. Similarly, in *Shelcusky v. Garjulio*, 797 A.2d 138, 149 (N.J. 2002), the New Jersey Supreme Court noted that "[c]ritical to [the contradictory affidavit rule's] appropriate use are its limitations." The Utah Supreme Court similarly emphasized that the rule must be administered with care. *Webster v. Sill*, 675 P.2d 1170, 1173 (Utah 1983).

A number of state courts have stated that the rule applies only where the affidavit "directly contradicts" or "clearly conflicts" with the prior statement. *See, e.g.*, *Shelcusky*, 797 A.2d at 149 (finding an affidavit must "patently" and "sharply" contradict earlier deposition testimony); *Henderson-Rubio*, 632 P.2d at 1295 n.6 (limiting the application of the rule only to cases "where the two statements are clearly inconsistent and no attempt is made to explain the inconsistency"); *Kiser v. Caudill*, 599 S.E.2d 826, 832 (W. Va. 2004) (observing that the rule prevents direct contradiction).

The state courts have often recognized that even where there is a direct contradiction, it is not within the province of the trial court to disbelieve it for purposes of summary judgment. *See, e.g., Taal v. Union Pac. R.R.*, 809 P.2d 104, 107 (Or. Ct. App. 1991) ("There is no reason why contradictory evidence from the same party or witness is less capable than inconsistent evidence from separate sources to create a disputed fact question."). Even in jurisdictions embracing a version of the contradictory affidavit rule, all that is required is an explanation in which the alleged

contradiction is plausible, and the burden of plausibility, of course, is considerably less than that of probability. *See, e.g.*, *Taal*, 809 P.2d at 107; *Gaw v. Dep't of Transp.*, 798 P.2d 1130, 1141 (Utah Ct. App. 1990).

**D. Iowa Approach.** The common law right to a jury trial took centuries to develop. Our founders declared the right to a jury trial "inviolate" in article I, section 9 of the Iowa Constitution. Iowa Const. art. I, § 9. The right to a jury trial is a bedrock of a remarkable and venerated democratic system that vests key governmental powers in everyday citizens, and not in government bureaucrats or professional judges with their implicit biases and limited perspectives.

Our system of justice vests the jury with the function of evaluating a witness's credibility. *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992). As this court has stated, "Assessment of a witness's credibility is uniquely within a lay jury's common understanding." *Id.* Traditionally, only in circumstances where "[t]he testimony of a witness [is] so impossible and absurd and self-contradictory . . . should [it] be deemed a nullity by the court." *Graham v. Chicago & N.W. Ry.*, 143 Iowa 604, 615, 119 N.W. 708, 711, *supplemented on reh'g*, 143 Iowa 604, 122 N.W. 573 (1909). This powerful and important constitutional background must be considered in determining the appropriate scope of any contradictory affidavit rule.

In *Baldi*, 880 N.W.2d 451, we applied the contradictory affidavit rule. In doing so, however, we emphasized that "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous." *Id.* at 464 (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009)). We have not had occasion, however, to develop the contradictory affidavit rule in depth.

**E. Discussion of Proper Scope of Rule.** From the above discussion of the caselaw, I think it plain that even where it is embraced,

the contradictory affidavit rule is a very narrow doctrine that should be applied only in the most compelling circumstances. If not so cabined, a robust version of the contradictory affidavit rule would invade a party's right to a jury trial under the Federal and Iowa Constitutions. The contradictory affidavit rule is a doctrine of last resort and should not be applied except in the most compelling of circumstances.

I also note that "even where the doctrine is recognized, it has often defied easy application." Michael D. Moberly, *Applying the Sham Affidavit Doctrine in Arizona*, 38 Ariz. St. L.J. 995, 998–99 (2006). In support of this proposition, Moberly cites a number of authorities. *Id.* at 999 n.24; *see Dudo v. Schaffer*, 91 F.R.D. 128, 131–33 (E.D. Pa. 1981) ("[T]here can be no absolute rule as to when it is proper for the [trial] court to exclude from consideration an affidavit which contradicts earlier deposition testimony."); *Shelcusky*, 797 A.2d at 147 ("Uniform standards on the application of the sham affidavit doctrine cannot be found in the case law."); Cox, *Sham Affidavit*, 50 Duke L.J. at 272 ("[S]tate courts have struggled to determine the best method of handling offsetting affidavits that contradict prior deposition testimony."). A narrowly defined rule thus has the benefit of providing more predictability, whilst a broader rule will foster judicial splatter of caselaw.

### III. Application of Contradictory Affidavit Rule to This Case.

I now proceed to apply the test. As indicated in the majority opinion, in the Susies' Iowa Rule of Civil Procedure 1.508 disclosure concerning their expert witness, Dr. Roger Schechter, it stated, in part,

> Dr. Schechter will also opine to a reasonable degree of medical probability regarding the treatability of Sharon Susie's infection at the point of time she presented to the urgent care clinic on September 29, 2012. He is also expected to testify that had the infection been diagnosed on the day of her visit to the clinic, and treatment initiated immediately, the spread

of the infection, more likely than not, could have been avoided, the infection would not have become systemic; and the amputation of Sharon's arm and toes would more likely than not have been avoided.

Then, at his subsequent deposition, Dr. Schechter made a number of statements that are claimed to be contradictory to his statement in the rule 1.508 disclosure. Specifically,

> Q. Or are you here to say that Sharon Susie's arm was cut off because of Sara Harty? A. I'm not here to say her arm was cut off because of Sara Harty. I'm here to say that she became ill and septic because she wasn't given a thorough enough evaluation or followup.

The majority finds this passage sufficient to trigger the contradictory affidavit rule, but there is nothing in this sequence that directly, clearly, and unambiguously contradicts Dr. Schechter's report. Dr. Schechter did not want to personalize the issue, but he plainly said that Susie "became ill and septic" because of the lack of a thorough evaluation at urgent care.

The next few lines of testimony also do not directly, clearly, and unambiguously contradict Dr. Schechter's report. Specifically, the additional testimony states,

> Q. Isn't the bottom line, you don't know what would have happened to Sharon Susie had she had CBC testing, had she returned to the clinic in 20 hours or less than 24 hours, had a comprehensive physical exam been documented? You don't know the outcome would not have been exactly the same. True? A. I don't know, but the faster you get to care when you're sick, the better off you are.

The majority makes much of this language, but it does not contradict Dr. Schechter's Iowa Rule of Civil Procedure 1.508 disclosure. Of course he does not *know* what the result would have been had she been given a thorough examination at the clinic. Knowledge implies certainty. A medical expert who believes a thorough examination at the urgent care clinic more likely than not would have avoided the subsequent amputation

does not "know" that this result necessarily would have occurred. There is always a chance of a bad outcome, even where it is more likely than not that, had a breach of the standard of care not occurred, a good outcome would result. In fact, an expert who believes an outcome is ninety-nine percent certain if a procedure is followed does not "know" the counterfactual result.

In a number of other passages, Dr. Schechter agreed that the outcome—if antibiotics had been timely administered—was "speculative." But, again, the concept of speculation is not a binary concept. The burden on the plaintiff in a medical malpractice case is not to eliminate all speculation and replace it with a standard of certainty, for that would be an impossible burden. Further, the mere mention of the word "speculation" is not a "gotcha moment" entitling the defendant in a medical malpractice case to summary judgment on causation. Instead, the degree of speculation must be so great that an expert cannot say, within a reasonable degree of medical certainly, that, more likely than not, the outcome would have been different.

Finally we have the last admittedly rather odd testimony from Dr. Schechter:

> Q: Do you agree with that -- that the earlier you get the antibiotics on board and the more you allow the body to mobilize in someone's immune system in response to this developing infection that you may well more likely than not have saved her arm?
>
> . . . .
>
> A: To -- I would say it's a significant possibility ranging as high as probability that early intervention with antibiotics could have either at least reduced the progression of the infection or slowed its progression and potentially have averted as much tissue loss as she experienced.

I think all of us can agree that this answer is difficult to penetrate. What, exactly, does it mean? And, is it directly, clearly, and unambiguously contradictory to Dr. Schechter's rule 1.508 disclosure? I do not think so. If the follow up question had been posed, asking whether he believed the arm more likely than not would have been saved, he may well have answered "yes."

For the above reasons, I do not believe the contradictory affidavit rule applies in this case. In order to protect the function of the jury, cases applying the contradictory affidavit doctrine should be as scarce as hen's teeth. Further, the rule's vitality is at least diminished where the witness involved is a nonparty expert. While it is certainly possible that a reasonable jury might find Dr. Schechter's testimony less than credible in light of his deposition testimony, that does not justify granting summary judgment. As a result, I would reverse the ruling of the district court and remand the matter for further proceedings.